UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LAURA ANN KRECIC, ) | CASE NO. 1:12CV1762 |
| ) | |
| Plaintiff, ) | MAGISTRATE JUDGE GEORGE J. |
| ) | LIMBERT |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN[1], ) | MEMORANDUM OPINION AND ORDER |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Laura Ann Krecic ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

**I.     PROCEDURAL AND FACTUAL HISTORY**

On October 18, 2007, Plaintiff applied for DIB and Supplemental Security Income ("SSI")[2], alleging disability beginning August 1, 2006. ECF Dkt. #10 ("Tr.") at 68-69.[3] Plaintiff met the insured status requirements of the Social Security Act through September 30, 2011 ("DLI"). Tr. at 25. The SSA denied Plaintiff's DIB application initially and on reconsideration. Tr. at 68-69. Plaintiff requested an administrative hearing, which was held on June 10, 2010. Tr. at 43-66. The

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]Plaintiff's application for SSI was not addressed by the ALJ in her Decision, nor is it the subject of this appeal.

[3]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

ALJ accepted the testimony of Plaintiff, who was represented by counsel, and Deborah Lee, a vocational expert ("V.E."). On August 27, 2010, the ALJ issued a Decision denying benefits. Tr. at 25-42. Plaintiff filed a request for review, which the Appeals Council denied on May 16, 2012. Tr. at 1-7.

On July 10, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On January 7, 2013, Plaintiff filed a brief on the merits. ECF Dkt. #14. On February 20, 2013, Defendant filed a brief on the merits. ECF Dkt. #15. No reply brief was filed.

**II**.     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was twenty-eight years of age on the alleged onset date and thirty-two years of age at the hearing, suffered from Crohn's disease, congestive heart failure, and major depressive disorder, which qualified as severe impairments under 20 C.F.R. §404.1520(c). Tr. at 27. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526 ("Listings"). Tr. at 27-29.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §404.1567(b)[4], except that she must have access to a restroom as needed and can never climb ladders, ropes, and scaffolds. Furthermore, Plaintiff is limited to tasks that are simple and routine, meaning they can be learned in thirty days or less, and low-stress work, that is defined as tasks not involving high production quotas such as piece work or assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing the work of others, and being responsible for the safety of others, and that involve limited superficial interaction with supervisors, co-workers, and the public. Tr. at 29.

---

[4]Light work involves lifting no more than twenty pounds occasionally with frequent lifting or carrying of objects weighing up to ten pounds. A job is in this category when it involves a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. 404.1567(b).

The ALJ ultimately concluded that, although Plaintiff could no longer perform her past work as a dining room attendant, server, sales clerk, and day care teacher, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of housekeeping/cleaner and mail clerk.[5] Tr. at 35. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

---

[5]Although the VE included the representative occupation of routine office clerk, the ALJ did not include it in her decision, finding that it is not necessarily unskilled and would potentially require tasks that would take more than thirty days to learn. Tr. at 35.

**IV.   STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

**V.   ANALYSIS**

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ erred in failing to properly analyze and account for all of Plaintiff's symptoms resulting from her Crohn's disease. Second, Plaintiff asserts that the ALJ should have given substantial weight to the opinion of the consultative examiner.

On July 13, 2003, a CT of Plaintiff's abdomen and pelvis revealed findings consistent with inflammatory bowel disease involving the distal small bowel, most likely representing Crohn's disease. Tr. at 213. Biopsies from a colonscopy and ileoscopy on October 4, 2003 were compatible with inflammatory bowel disease, with Crohn's disease favored. Tr. at 314.

Plaintiff's alleged onset date – August 1, 2006 – coincides with a three-day hospitalization at Fariview Hospital that resulted in diagnoses of abdominal pain and possible exacerbation of Crohn's disease. Tr. at 210. Plaintiff complained of severe abdominal pain in the mid abdomen with radiation to the right and left lower quadrant areas. A CT of the abdomen/pelvis revealed inflammatory process in the right lower quadrant, likely associated with Crohn's disease and associated wall thickening of the proximal colon was noted. Tr. at 307-308. An MRI of the abdomen revealed intra and extra hepatic biliary ductal dilation and possible intraductal calculus in the mid portion of the common bile duct Tr. at 306. Plaintiff was ultimately treated with an antibiotic because of a possible inflammatory/infectious process in the right lower quadrant area, and her abdominal pain subsided significantly.

Plaintiff's discharge summary reveals that Plaintiff had been prescribed Imuran (Azathioprine) by Robert F. Staub, M.D., approximately seven days prior to her hospitalization. According to Dr. Staub, Plaintiff was "not very compliant with taking her medication and sometimes she stop[ped] her medication completely by herself without consulting her physician." Tr. at 201. Plaintiff conceded that she stopped taking Remicade, which was previously prescribed, approximately two months earlier because of her "intention to get pregnant." Tr. at 210.

Medical records from Julie P. Adams, D.O., dated September 12, 2006 through December 11, 2007 documented continued complaints of abdominal pain, Tr. at 201, abdominal cramping, Tr. at 205, and fatigue and exhaustion. Tr. at 203. Dr. Adams' examination revealed tenderness to light palpitation in the bilateral lower quadrants, with a diagnosis of Crohn's disease. Tr. at 201, 205. Plaintiff was prescribed steroids secondary to Crohn's flares on February 22, 2007 and March 7, 2007. Tr. at 203, 204. On August 26, 2007, Plaintiff sought emergency room treatment for abdominal pain and had abdominal tenderness. Tr. at 486-487. She was diagnosed with abdominal pain nonspecific. Tr. at 487. She also had nausea, vomiting and flatus. Tr. at 488.

Plaintiff was hospitalized again from August 29 through September 1, 2007 with complaints of chest pain and shortness of breath eight days after giving birth by Cesarean section. Tr. at 361. She also complained of abdominal pain, nausea and vomiting. Tr. at 364. Plaintiff's blood pressure, pulse and respiratory rate were elevated. Tr. at 361. Plaintiff was diagnosed with hypertensive

emergency and congestive heart failure. Tr. at 362. Chest x-ray was read as cardiomegaly (an abnormal enlargement of the heart) with congestive heart failure. Tr. at 516.

On November 1, 2007, Plaintiff received a Remicade infusion. Tr. at 277. On November 5, 2007, Plaintiff was evaluated by Edmond W. Blades, M.D., who reported that she was previously pregnant from November 2006 to August 21, 2007, and had flare-ups of her Crohn's disease in December of 2006 and September of 2007. Tr. at 258. Dr. Blades observed that she was "on Remicade every two months for about two years and is doing great." Tr. at 264. He further observed that "[s]he was given Remicade on [November 1, 2007] since it worked so well before and in fact is working again." Tr. at 264. Remicade reduced Plaintiff's bowel movements in number per day from ten to twelve to four, and normally two. Tr. at 264.

A follow-up visit with Dr. Blades on December 3, 2007 revealed that Plaintiff continued to suffer right lower quadrant abdominal pain, cramping, up to eight bowel movements a day, and vomiting three to four times a week. Tr. at 263. Dr. Blades' examination revealed multiple stria across the entire abdomen, right lower quadrant tenderness to light and deep palpation, and minimal guarding. Tr. at 263. Dr. Blades observed that Plaintiff was not responding to aggressive medical therapy in the form of Prednisone, Imuran, and Remicade. Tr. at 263.

On December 4, 2007, a small bowel series revealed a dilated ileum, and possible small fistula formation from the descending colon. Tr. at 217. On December 11, 2007, a CT scan of the abdomen and pelvis revealed ill-defined soft tissue mass in the right lower quadrant of the abdomen containing free air consistent with abscess formation or inflammatory mass, significant mesenteric edema in the right lower quadrant of the abdomen adjacent to the cecum, inflammatory wall thickening of the cecum and terminal ileum consistent with Crohn's disease; fluid-containing slightly dilated ileal and distal jejunal loops; and biliary dilation, cause indeterminate. Tr. at 215.

On December 11, 2007, Plaintiff reported to Dr. Adams that Remicade did not seem to be helping, and she could not afford Bentyl. Tr. at 205. Plaintiff was hospitalized from December 11-18, 2007, with initial complaints of abdominal pain, diarrhea, and nausea. Tr. at 339, 346. On December 13, 2007, Plaintiff underwent an exploratory laparotomy, lysis of adhesions, drainage of the intra-abdominal abscess, debridement of the abscess wall, right hemicolectomy and resection

of the distal ileum, with anastomosis of the ileum to the ascending colon for ruptured Crohn's disease of the ascending colon, with localized abscess and possible fistula of the small bowel. Tr. at 208.

A right hemicolectomy revealed Crohn's enteritis with fistula, abscess formation and numerous interloop serosal adhesions Tr. at 333. She was diagnosed with peritoneal abscess, intestinal abscess, perforation of intestine, congestive heart failure, enteritis of small or large intestine, intestinal fistula, peritoneal adhesions postoperatively, hypopotassemia, esophageal reflux, and dyspneic disorder. Tr. at 337.

Plaintiff was assessed by Deborah Koricke, Ph.D., on January 23, 2008, on behalf of the state agency. She reported having depression for about five years, feeling tired and fatigued, difficulty sleeping, and feeling hopeless. Tr. at 371. Plaintiff spoke in a monotone and showed very little, if any, animation; she was withdrawn and cried numerous times throughout the interview. Tr. at 372. Her depression had increased due to her health issues. Tr. at 372. Her sleep was interrupted, she felt helpless and hopeless, she had no energy, and had difficulty concentrating. Tr. at 372. Plaintiff's concentration was affected during the interview as questions had to be repeated, and she had difficulty understanding questions secondary to attention deficits and difficulty concentrating due to depression. Tr. at 372. She has lost interest in her hobbies such as making jewelry and sewing. Tr. at 373.

Dr. Koricke diagnosed major depression, single episode, moderate, and assigned a Global Assessment of Functioning ("GAF") score of 35.[6] Tr. at 373. She opined that Plaintiff's ability to relate to others, her ability to understand, remember, and follow instructions, her ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks, and her ability to withstand stress and pressure associated with day-to-day work activity were all moderately limited.

---

[6] A GAF score is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. A score between thirty-one and forty indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work).

Tr. at 374. Dr. Koricke concluded that Plaintiff was "not viewed able to withstand the stress and pressures of working on a daily basis and she is highly susceptible to stress." Tr. at 374.

On March 27, 2008, Karen Stailey-Steiger, Ph.D., acting on behalf of the state agency, wrote that she gave Dr. Koricke's opinion weight as there was no treating statement. Tr. at 392-395. She nonetheless concluded that Plaintiff was capable of simple, routine tasks without strict time or production quotas or more than superficial interaction with coworkers and the public. Likewise, on June 4, 2008, Roseann Umana, Ph.D., gave weight to Dr. Koricke's opinion, but she affirmed Dr. Stailey-Steiger's conclusions regarding Plaintiff's ability to work. Tr. at 433. On March 15, 2008, Gary Demuth, M.D., a state agency physician, reviewed the medical and other evidence in the record and concluded that Plaintiff could perform light work that did not involve climbing ladders, ropes, or scaffolds. Tr. 381-388. On August,15, 2008, Anton Freihofner, M.D., another state agency physician, affirmed Dr. Demuth's assessment.

Sapna Thomas, M.D., a gastroenterologist, completed a questionnaire in which he acknowledged that Plaintiff was diagnosed with Crohn's disease, had surgery for an obstruction, a fistula, in December 2007, and had malabsorption secondary to inflammation of the intestine. Tr. at 377. In a January 21, 2008 letter, Dr. Thomas documented that Plaintiff reported twelve bowel movements a day and had stopped her therapy, but would start Azathioprine and restart Remicade. Tr. at 415, 416. In an April 7, 2008 letter, Dr. Thomas reported that Plaintiff was experiencing ten to twelve bowel movements per day with occasional mucus. Tr. at 414. Plaintiff had not taken her Azathioprine since at least January due to financial issues. Tr. at 414.

Records from Basel Moussa, M.D., a cardiologist, on March 31, April 16, and June 11, 2008, document Plaintiff's complaints of anxiety and depression, chest tightness, and fatigue. Tr. at 417, 420, 430. Plaintiff's ejection fraction[7] and fatigue improved with treatment. Tr. at 417.

An initial evaluation was performed by Dr. Diane Dale, M.D., on May 15, 2008. Plaintiff reported experiencing panic attacks and became overwhelmed after her mother died and while she was preparing for her upcoming wedding. Tr. at 423. Her last panic attack was on May 12, 2008

---

[7]In cardiovascular physiology, ejection fraction represents the volumetric fraction of blood pumped out of the ventricle with each heart beat or cardiac cycle.

and lasted a couple of minutes after her son was diagnosed with ADHD. Tr. at 423. Symptoms included initial insomnia for one to two hours; fatigue and feeling drained during the day; and feeling that her life was not worth living a few months ago but she could not leave her children. Tr. at 424. Plaintiff was diagnosed with major depressive disorder and agoraphobia with panic disorder. Tr. at 427. Follow- up records from Dr. Dale on June 26, 2008, revealed some improvement in sleep, anger, and frustration, but she was still tense. Tr. at 438.

Plaintiff was seen by Jennifer Henson, M.D., on July 7, 2008 for left knee pain after falling to her knees at the store . Tr. at 553. Plaintiff stated that she thought she "pulled something." Tr. at 553. She experienced soreness of the knees, pain when going up hills and stairs, and her knee would lock up. Tr. at 553. The impression was left knee pain. Tr. at 553. Dr. Hudson's examination revealed left positive McMurray's test, used to evaluate tears of the meniscus of the knee, and medial joint line tenderness. Tr. at 553. On July 8, 2008, x-rays of Plaintiff's knees were unremarkable. Tr. at 431.

Plaintiff saw Mary Yursky, CNP, on August 11, 2008. Plaintiff complained of intermittent abdominal pain and intermittent loose stools for one to two weeks. Tr. at 576. Plaintiff reported that, she was feeling well on the day of her appointment. Plaintiff had received a Humira injection on August 7, 2008, and, as a result, her bowel movements were reduced to four times a day, and she was not experience abdominal pain or cramping. Plaintiff reported that she has four or five good days after a Humira injection, that is, her stools are formed and she does not have urgency, chills, fever, nausea, or vomiting. Tr. at 576. At a follow-up visit with Dr. Thomas on September 17, 2008, Plaintiff again reported doing well after her Humira injection for five to six days, but then had increasing symptoms on the week between her injections. Tr. at 578. As a consequence, Plaintiff's Humira injections were increased to a weekly basis. Tr. at 578.

Plaintiff had an initial evaluation with F. Gregory Noveske, M.D., on May 20, 2009. Plaintiff complained of anxiety and depression and was struggling with her mood. Tr. at 579. She experienced a lot of worry, especially when trying to fall asleep, reported self isolation, had vague suicidal ruminations, and poor sleep. Tr. at 579. According to Dr. Noveske, Plaintiff appeared depressed. Tr. at 579. He diagnosed major depressive disorder, moderate in severity, recurrent. Tr.

at 580. The following day, Plaintiff's husband called because his wife was feeling increasingly depressed with thoughts of self-mutilation. Tr. at 580.

Plaintiff sought treatment at the emergency room on May 21, 2009 with complaints of "having a hard day emotionally." Tr. at 457. She has some thoughts of cutting herself and her psychiatrist told her to go to the hospital. Tr. at 457. She was anxious and tearful. Tr. at 461. The final diagnosis was depression. Tr. at 458.

Plaintiff returned to the emergency room on May 22, 2009 for jaw pain, including having a difficult time closing her mouth. Tr. at 446. Examination revealed that, at some point, it seemed her jaw was out of alignment, but most other times it was fine, and was diagnosed with right temporomandibular joint pain. Tr. at 446. An x-ray of the jaw was negative. Tr. at 453. In a follow-up report with Dr. Adams, Plaintiff reported that her jaw spasms had resolved, but she reported a panic attack which was one of her worst and stated that everything made her nervous, and she reported joint pains. Tr. at 557. Dr. Adams' impression was anxiety with panic attack and joint pain. Tr. at 557.

Dr. Thomas' report, dated June 17, 2009, revealed that Plaintiff was having eight bowel movements a day and occasional cramping which resolved with Bentyl, an antispasmodic and anticholinergic. Tr. at 464. She also reported some fatigue and occasional joint pain and stiffness. Tr. at 464.

Dr. Noveske's medical records from June 8, 2009 through February 3, 2010 document that Plaintiff was struggling with her mood, and had some suicidal ruminations but denied any actual intent to injure herself. Tr. at 519, 520, 539, 589. She tried different medications and dosages of Lexapro, Lamictal, Abilify and Trazodone Tr. at 519, 520, 539, 589. She consistently reported improvement in her overall mood, but she was still symptomatic. Tr. at 519, 539.

On July 6, 2009, Plaintiff saw Dr. Donna J. Sexton-Cicero for a rheumatological evaluation. Tr. at 583. She reported joint pain in her left ankle and right knee for several months, low back pain, heel pain, and hand pain. Tr. at 583, 584. She experienced stiffness and swelling in her hand for thirty minutes in the morning. Tr. at 583. Dr. Sexton-Cicero's impression was asymmetric inflammatory arthropathy likely due to her Crohn's disease. Tr. at 584.

In a letter dated September 30, 2009, Dr. Thomas observed that Plaintiff was doing well until two weeks before her visit when she had significant diarrhea up to twelve times per day. Tr. at 523. She was prescribed antibiotics which resulted in significant improvement, but continued having abdominal pain. Tr. at 523.  Plaintiff could not recall whether her next Humira injection was scheduled for the next day or the following Thursday.

On October 1, 2009, a colonscopy revealed a hyperplastic polyp which was removed, and multiple linear ulcerations identified within the bowel mucosa with biopsies showing focal active inflammation and ulceration.  Tr. at 528, 525. Plaintiff saw Dr. Adams on October 5, 2009, for treatment of diffuse moderate tenderness with palpation of the abdomen. Tr. at 559. Plaintiff was diagnosed with Crohn's disease-chronic immunosupression, colonic spasms/abdominal pain, and depression. Tr. at 559.

After complaints of right knee pain, an examination on January 11, 2010, showed positive Lachman's and McMurray's signs and tenderness on the patellar when pressed posteriorly. Tr. at 560.  Plaintiff was diagnosed with possible MMT and ACL tears.  Tr. at  560.  Records from Independence Urgent Care from April 1, 2010, revealed diagnoses of anxiety/depression for which she was prescribed Xanax. Tr. at 529, 532. Plaintiff lost approximately forty pounds in four months, between October 26, 2009  and April 1, 2010. Tr. at 529, 534. She was prescribed Percocet for her pain. Tr. at 530, 531, 535.

At the hearing, Plaintiff testified that she lives with her husband and three children, ages eight, three, and two.  Tr. at 49.  Plaintiff is 5'5 and weighed 167 pounds.  She graduated from high school and took courses at a local community college.  Her longest term of employment was seven years at a day care center.

Plaintiff testified that she cannot work due to frequent bowel movements, exhaustion, and constant pain, which is caused by her Crohn's disease and joint problems. Tr .at 50. She rated her daily pain at a four or five out of ten, but testified that her pain increases with a bowel movement. Plaintiff further testified that she wakes up with nausea every day, and that her bowel movements per day vary.  She stated, "On the best day it has been noted nine times a day, the worst day when a major flare up can be up to 17 times a day."  Tr. at 50.

-11-

Plaintiff's treatment included Humira injections every two weeks, and Imuran and Prednisone during a bad flare-up. She testified that the last time she was prescribed steroids was in 2007, during her pregnancy and then six months after her daughter was born when she had her bowel surgery. Tr. at 51. She further testified that she has not been prescribed steroids because "on a good day it's about nine times a day and to be honest with you I can't afford to go to the doctor all the time or to afford my medication. So sometimes I put off going to the doctor, which makes things tremendously worse." Tr. at 51.

Plaintiff's joint problems began approximately one and a half years prior to the hearing. Tr. at 53. She has stiffness and pain in her legs and right knee, and she has difficulty navigating stairs, but the pain subsides "after a while." Tr. at 51. She takes Advil and Percocet to reduce inflamation and control her pain, but Advil is typically not effective. Tr. at 52. Plaintiff testified that she can stand for one half hour, and walk for one hour. Standing causes greater joint pain than walking. She had no difficulty sitting.

Plaintiff testified that she prepares her children for school each morning, which usually exhausts her. Tr. at 53. She reads during the day, but looks forward to her daughter's naps, because she sleeps as well. However, Plaintiff testified that she is not refreshed after a nap, instead she is more exhausted. Tr at 54.  Plaintiff does some light laundry and she tries to cook. Her son helps her shop for groceries. Tr. at 55.

At the hearing, Plaintiff stated that she no longer liked to go places, but that her father visited her every Sunday. Tr. at 55. She claimed that she always knew there was something wrong with her and that she was not surprised when she was diagnosed with bipolar disorder. She feels worthless and has obsessive anxiety, which prevents her from sleeping. Tr. at 58. She does not want to be around other people because she does not feel worthy. Tr. at 55.

Plaintiff went to a performing arts high school, but no longer has the energy to act or make jewelry, which were two of her passions. Tr. at 58. Plaintiff testified that it has gotten to the point where she wants to hurt herself. Tr. at 56. She further testified that her prescription medication – Lexapro and Lamictal – "help mildly," but she still has "highs and lows." Tr. at 56. She cries "quite a bit" and makes "erratic decisions." Tr. at 56-57. Plaintiff stated that she buys things she cannot

afford or does not pay her bills. Tr. at 58. She testified that her medication causes nausea and fatigue. Tr. at 57.

Turning to Plaintiff's first argument, the social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 416.929. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.; Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at

1234.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence.  *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

The ALJ predicated her conclusion that Plaintiff's allegations of disability were only partially credible upon the fact that they were generally inconsistent with the evidence of record as a whole.  The ALJ wrote:

> The medical records document that [Plaintiff's] symptoms were controlled and stable when she was compliant with medications.  Although [Plaintiff] exhibited occasional physical and mental exacerbations, these instances resulted when [Plaintiff] stopped taking her medications as prescribed or altogether.  The progress notes indicate that [Plaintiff] condition would stabilize well within twelve months once she resumed her medications or an appropriate medication was found.
>
> [Plaintiff's] allegations regarding the severity of her symptoms are not substantiated by the evidence of record. [Plaintiff] alleged that she has up to 17 bowel movements in a day at the worst.  However, the medical records indicate that [Plaintiff] did not exceed 12 in a day at the worst.  Also, current progress notes indicate that [Plaintiff's] bowel movements have significantly improved with Humira injections.

Tr. at 34.

Defendant correctly argues that, in evaluating Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms, the ALJ specifically considered Plaintiff's complaints in her initial application for benefits in which she reported constant, severe pain.  Tr. at 30, 120. The ALJ also considered Plaintiff's testimony regarding fatigue and nausea, as well as other symptoms of Crohn's disease. Tr. at 30, 50-55. The ALJ then considered Plaintiff's complaints in the context of the medical evidence, which essentially showed that her symptoms were controlled in large measure with medication. Tr. at 30.

For example, although her symptoms increased during her pregnancy when she was not taking Remicade, once she resumed treatment, in approximately November of 2007, her condition improved and her bowel movements decreased from ten to twelve per day to four per day. Tr. at 264. Plaintiff reported ten to twelve bowel movements per day again in April 2008, but, as Dr. Thomas indicated, she had not taken medication for her Crohn's disease since January. Tr. at 414. By September of 2008, after Dr. Thomas had restarted her Humira injections and Azathioprine, Plaintiff was doing well. Tr. at 578. By June of 2009, Plaintiff's bowel movements had decreased to eight per day. Tr. at 464. She continued to do well in September of 2009. Tr. at 585. Given the evidence

of steady improvement, the ALJ reasonably determined that Plaintiff's allegations regarding the frequency and intensity of her symptoms were not fully credible.

Furthermore, it is important to note that the ALJ found that Plaintiff's medical condition could be expected to produce pain, but not the kind of severe pain that Plaintiff alleged. The ALJ did not totally reject Plaintiff's allegations of pain, but rather, she determined that Plaintiff's allegations of the intensity, duration and limiting effects of her symptoms were not substantiated by the objective medical findings or other evidence in the record. An ALJ is not required to accept a plaintiff's own testimony regarding her pain. *See Gooch v. Secretary of Health and Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).

Plaintiff next asserts that the ALJ reliance upon Plaintiff's failure to take her medication as prescribed was misplaced, because Plaintiff was oftentimes unable to afford her medication. To the contrary, Dr. Staub acknowledged that Plaintiff was "not very compliant with taking her medication and sometimes she stop[ped] her medication completely by herself without consulting her physician." Tr. at 201. Likewise, Plaintiff conceded that she stopped taking Remicade in April of 2006 because of her "intention to get pregnant." Tr. at 210. Accordingly, Plaintiff cannot show that the ALJ erred when she relied upon evidence of Plaintiff's non-compliance with her prescribed medication regimen, where the record contains evidence that Plaintiff stopped taking her medication for reasons other than the cost.

In her second argument, Plaintiff asserts that the ALJ claimed to give great weight to the opinion of Dr. Koricke, but did not address Dr. Koricke's conclusion that Plaintiff could not withstand the stress and pressure of full-time work. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. "[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

Plaintiff contends that the ALJ purported to give great weight to Dr. Koricke's opinion, but nonetheless, concluded that she was capable full-time work, despite Dr. Koricke's conclusion that Plaintiff was "not [ ] able to withstand the stress and pressures of working on a daily basis and she is highly susceptible to stress." Tr. at 374. Although Dr. Koricke concluded that Plaintiff was not able to withstand the stress and pressure of full-time work, Dr. Koricke opined in the same paragraph that Plaintiff was only moderately limited in her ability to withstand the stress and pressure associated with day-to-day work activity. Because Dr. Koricke's disability assessment is internally inconsistent, the ALJ did not err in crediting the internally-consistent portions of her opinion and considering the other evidence in the record, that is, the medical notes and state agency opinions, in order to conclude that Plaintiff is capable of full-time work, albeit light work that is simple, routine, and low-stress.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: September 20, 2013

                                                  */s/George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE